UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Elizabeth R. Donatello,

                                        Plaintiff,                          **REPORT AND**
                                                                            **RECOMMENDATION**

                        v.                                                  15-CV-39V

County of Niagara,

                                        Defendant.

## I.    INTRODUCTION

Plaintiff Elizabeth Donatello ("Donatello") is an Assistant District Attorney for the County of Niagara (the "County").  Donatello has sued the County, alleging sex-based discrimination, sexual harassment, and retaliation, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; and under the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290–301.  The County filed a motion (Dkt. No. 32) to dismiss Donatello's second amended complaint under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").  The County's Rule 12(b)(1) argument dominates its motion papers.  The County argues that Donatello does not qualify as an "employee" under Title VII because she falls under the "personal staff" and "policy making" exceptions to that definition under 42 U.S.C. § 2000e(f).  The County further asserts that employee status for Title VII purposes is jurisdictional, meaning that Donatello's inability to qualify as an employee deprives the Court of the power to adjudicate the case.  Donatello responds that employee status goes to the merits of a case, not to the Court's subject-matter jurisdiction.  Donatello argues in the alternative that any jurisdictional inquiry would be incomplete unless she conducted discovery to help present a full explanation of

her job duties and employee status.  With respect to discovery, the parties have cross-motions pending—a motion from the County to stay discovery until the Court resolves the motion to dismiss (Dkt. No. 36) and a motion from Donatello to compel discovery that would help with any jurisdictional inquiry into employee status (Dkt. No. 39).

The case was referred to this Court under 28 U.S.C. § 636(b) (Dkt. No. 9), and the Court has deemed all three pending motions submitted under FRCP 78(b).  For the reasons below, the Court respectfully recommends denying the County's motion to dismiss and denying the discovery -related cross-motions as moot.

## II.    BACKGROUND

This case concerns Donatello's allegations that the Niagara County District Attorney's Office has been permeated with derogatory comments about women, hiring and work management policies that discriminated against women, and retaliatory conduct when women make complaints.  Donatello began working for the County as an Assistant District Attorney in 2004 and continues to work there.  In January 2008, Michael Violante ("Violante") took office as District Attorney[1] and moved Donatello into a full-time position with the Special Victims Unit ("SVU").  According to the second amended complaint, "Violante was responsible for and oversaw all attorneys in the SVU, including Plaintiff."  (Dkt. No. 29 at 3.)

Donatello then proceeded in the second amended complaint to describe the environment at her workplace.  Throughout his time as District Attorney, Violante allegedly "created a hostile

---

[1] The Court takes judicial notice that Violante resigned as Niagara County District Attorney on March 21, 2016.  (*See* Dkt. No. 32-1 at 7.)  *See also* Thomas J. Prohaska, *Niagara County DA resigns in wake of sex harassment complaints* (Mar. 21, 2016), http://www.buffalonews.com/city-region/all-niagara-county/niagara-county-da-resigns-in-wake-of-sex-harassment-complaints-20160321.  The resignation in itself would appear to have no impact on any aspect of the case, and the parties have not suggested otherwise.

and unwelcoming atmosphere for women, including plaintiff, by making it clear through words and actions that women were held to a wholly different standard than male employees regarding work obligations and hours and by openly judging women on their appearance, including their weight, hair style and breast size." (*Id.*) Donatello then described several examples of conduct that created the hostile atmosphere. "One particularly offensive comment occurred in in April of 2013, when Violante commented on a case in which an intoxicated, unconscious woman had been raped.  Violante commented to Plaintiff, 'Can you believe we're prosecuting this shit?'  He went on to say 'that's what boys do; you try to get the girl drunk and then have sex.'  As she had done on multiple other occasions when similar offensive comments had been made, Plaintiff expressed to Violante her displeasure with his inappropriate comments.  On this occasion Violante merely retorted that, 'Well, I'd try to make sure it was my girlfriend.'" (*Id.* at 5.)

Next, Donatello described alleged discriminatory behavior and policies at her workplace. "As one example of his expression of a discriminatory policy, Mr. Violante has vocalized his desire to not hire women who he believes were going to have children, and has frequently 'commented' on his preference that women employees use birth control or have tubal ligations." (*Id.* at 5–6.)  A male colleague in the SVU allegedly made over $30,000 more than Donatello even though "he worked many fewer hours, was frequently late to work, and a substantial portion of his work was shifted over to plaintiff.  Plaintiff was consequently forced to work substantially more hours and incur much greater stress and job pressure to handle the added workload." (*Id.* at 6.)  When Donatello complained, "Mr. Violante acknowledged the inequity, but refused to take action because he stated that the male co-worker was a single father who had children he needed to care

3

for . . . . Violante stated that plaintiff had her husband to [] support [] her.  He thereby refused to equalize their responsibilities or pay." (*Id.* at 6–7.)  When Donatello suffered an extended illness in 2014, she allegedly "was denied pay and benefits afforded to other employees . . . . On her return to the job, plaintiff was removed from her position in the SVU and placed in a job which requires her to travel more extensively and for which she has not been provided adequate support." (*Id.* at 9.)

The alleged facts in the second amended complaint also included instances of retaliation. "Whether it involved an inappropriate policy, comment or behavior, at all relevant times, plaintiff has been vocal in objecting to discriminatory behaviors, and has complained both to Mr. Violante and to Human Resources representatives.  Despite her complaints, no action has been taken to ameliorate the crude and derogatory behavior and comments and discriminatory policies, which have continued to this date.  Defendant has further retaliated against plaintiff for speaking up and asserting her rights." (*Id.* at 6.)  In one instance, on February 27, 2013, Donatello complained that she was overloaded with work and that her workload would improve if her coworker were in the office on a full-time basis.  Violante angrily ignored the suggestion.  (*Id.* at 7.)  On March 6, 2013, Donatello and Violante had an argument over her complaints about her coworker and how the complaints "were causing problems in the office." (*Id.*)  The argument ended with Violante telling Donatello that she was fired.  "Later that day, Plaintiff received a hand delivered letter to her home from Violante stating his conditions which would allow Plaintiff to return to work.  A meeting was arranged for the following week.  At the meeting, Plaintiff was told that Violante would deal with the co-worker in whatever manner he saw fit and Plaintiff would have to accept it.  Plaintiff's

complaints were not addressed and she was told to stop objecting to the disparate treatment. Since Plaintiff needed her job, and because she wanted to continue to work for the SVU crime victims, Plaintiff agreed to the terms and returned to her duties." (*Id.*; *see also* Dkt. No. 13-5 at 23–25.)  Later that year, on September 3, 2013, a local newspaper published a negative article about Donatello and her complaints about her workplace.  (*See* Dkt. No. 29 at 8; Dkt. No. 13-4.)  Donatello believes that someone from the County furnished the information to the newspaper.

Prior to any litigation, Donatello filed discrimination and retaliation charges with the Equal Employment Opportunity Commission ("EEOC") on October 17, 2013 and June 6, 2014. The parties do not dispute that Donatello complied with the necessary administrative prerequisites to litigation in a timely fashion.  The parties do not dispute that Donatello filed her original complaint in a timely fashion as well.

Donatello filed her second amended complaint on March 22, 2016.  The second amended complaint contained four claims.  In the first claim, Donatello accused the County of discrimination in violation of Title VII.  In the second claim, Donatello accused the County of sexual harassment in violation of Title VII.  In the third claim, Donatello accused the County of retaliation in violation of Title VII.  In the fourth claim, Donatello accused the County of retaliation in violation of the NYSHRL.

The County filed its motion to dismiss on March 24, 2016.  The County contends that the Court lacks subject-matter jurisdiction over Donatello's Title VII allegations because the statute covers only "employees," and Donatello falls under two jurisdictional exceptions to employee status described in 42 U.S.C. § 2000e(f).  "Assistant district attorneys, including Donatello, are

5

appointed and removed by the district attorney, an elected public official.  They are required by statute to perform work that the district attorney directs, assigns, and supervises.  The obligations of this role, and the sensitive nature of the work, demand a close working relationship with the district attorney, to whom an assistant district attorney is, ultimately, held personally accountable. Accordingly, assistant district attorneys are the personal staff of an elected official and are exempt from Title VII protections.  Moreover, Donatello is also in a policy making position under Second Circuit precedent." (Dkt. No. 32-1 at 6.)  According to the County, another statute exists to provide relief for people like Donatello who do not qualify as employees under Title VII, but Donatello did not satisfy that statute's prerequisites.  Once the Title VII claims are dismissed, the County prefers that the Court decline to exercise supplemental jurisdiction over Donatello's NYSHRL claim.  Donatello disagrees that the exemptions listed in 42 U.S.C. § 2000e(f) are jurisdictional.  "While no cases in the Second Circuit or any district court in New York hold specifically that the question whether a party is an 'employee' under Title VII is nonjurisdictional, based on the rule set forth by the Supreme Court in *Arbaugh* [*v. Y&H Corp.*, 546 U.S. 500 (2006)], and its application by other circuits to similar facts, this Court must hold that the question of Plaintiff's 'employee' status is nonjurisdictional.  Every circuit court to consider this issue has found accordingly." (Dkt. No. 40-3 at 12.)  In the alternative, Donatello argues that an inquiry into subject-matter jurisdiction is fact-intensive and warrants discovery before a final ruling from the Court.

    The issue of discovery prompted the filing of the two pending cross-motions.  On April 6, 2016, the County filed a motion to stay discovery until resolution of its motion to dismiss.  (Dkt.

No. 36.)  The County contends that its motion to dismiss will dispose of Donatello's case

altogether or, at a minimum, narrow it to a single claim under state law.  Awaiting that potential

outcome is important to the County because it "will expend considerable resources responding to

Donatello's expansive discovery requests and Donatello may improperly obtain information and

documents to which she is not otherwise entitled if the Motion to Dismiss is ultimately granted."

(Dkt. No. 36-3 at 5.)  Donatello filed her cross-motion to compel discovery on April 19, 2016.

(Dkt. No. 39.)  Donatello disagrees that her discovery requests have been expansive and considers

discovery important to her defense against the pending motion to dismiss.  "On a motion to

dismiss for lack of subject matter jurisdiction, the Court is tasked with making factual findings and

weighing evidence outside the pleadings.  The production of the requested documents is necessary

so as to allow Plaintiff the opportunity to present all facts relative to subject matter jurisdiction and

appropriately rebut Defendant's motion to dismiss (at [t]his point with supplemental opposition

papers)."  (Dkt. No. 39-3 at 5.)

III.    DISCUSSION

### A. Motions to Dismiss under Rule 12(b)(1) Generally

The general standard for dismissal under Rule 12(b)(1) is fairly straightforward.  "A case is

properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district

court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. U.S.*, 201 F.3d 110,

113 (2d Cir. 2000) (citation omitted).  Defendants have two ways, facial and factual, to challenge

subject-matter jurisdiction under Rule 12(b)(1):

> The first way is to mount a challenge which accepts the plaintiff's version of
> jurisdictionally-significant facts as true and addresses their sufficiency, thus
> requiring the court to assess whether the plaintiff has propounded an adequate

7

basis for subject-matter jurisdiction.  In performing this task, the court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly.  For ease in classification, we shall call this type of challenge a "sufficiency challenge."

The second way to engage the gears of Rule 12(b)(1) is by controverting the accuracy (rather than the sufficiency) of the jurisdictional facts asserted by the plaintiff and proffering materials of evidentiary quality in support of that position. Unlike, say, a motion for summary judgment under Federal Rule of Civil Procedure 56(c), this type of challenge under Federal Rule of Civil Procedure 12(b)(1)—which we shall call a "factual challenge"—permits (indeed, demands) differential factfinding.  Thus, the plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties.  In conducting this inquiry, the court enjoys broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to determine its own jurisdiction.

The rationale for this praxis is obvious.  A court's authority to hear a particular case is a necessary precondition to the proper performance of the judicial function.  Thus, when a factbound jurisdictional question looms, a court must be allowed considerable leeway in weighing the proof, drawing reasonable inferences, and satisfying itself that subject-matter jurisdiction has attached.

*Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363–64 (1st Cir. 2001) (citations omitted); *see also, e.g.*,

*Carter v. HealthPort Techs., LLC*, ___ F.3d ___, 2016 WL 2640989, at *6–7 (2d Cir. May 10, 2016)

(summarizing facial challenges, where "the plaintiff has no evidentiary burden," and factual

challenges, where "the plaintiffs will need to come forward with evidence of their own to

controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion reveal

the existence of factual problems in the assertion of jurisdiction") (internal quotation and editorial

marks and citations omitted); *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir.

2015) (summarizing that "[a] facial attack concerns an alleged pleading deficiency whereas a factual

attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites") (internal quotation and editorial marks and citations omitted).

Here, the County argues that Donatello falls so unequivocally under two of the exemptions in 42 U.S.C. § 2000e(f) that her request for discovery to oppose the motion to dismiss is "fatally flawed." (Dkt. No. 42 at 7.) The Court construes the County's position as making a facial challenge to the Court's jurisdiction and will assess the motion to dismiss accordingly. The Court will conduct a factual review on its own initiative if and only if it needs to establish key facts to confirm jurisdiction. *See, e.g., Mastafa v. Chevron Corp.*, 770 F.3d 170, 186–87 (2d Cir. 2014) ("Finally, we note that although a district court might deny a motion to dismiss brought pursuant to Rule 12(b)(1) if it concludes that the *complaint* passes jurisdictional muster, that does not obviate the district court's continuing obligation to ensure its own jurisdiction as the case proceeds to discovery. If subsequent materials in the record cast sufficient doubt upon the allegations in the complaint that formed the basis for the court's subject-matter jurisdiction, the court must revisit the question of its jurisdiction *sua sponte*, or upon a party's motion.") (citations omitted).

### B. *Subject-Matter Jurisdiction Generally*

Before turning to the specifics of the County's facial challenge under Rule 12(b)(1), the Court needs to take the time to clarify what subject-matter jurisdiction actually is. Clarification is important because the Supreme Court has expressed concern in recent years that lower courts are using the word "jurisdiction" too casually, and that "[j]urisdiction, it has been observed, is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (internal quotation marks and citations omitted); *see also Kontrick v. Ryan*, 540 U.S. 443, 454

9

(2004) ("Courts, including this Court, it is true, have been less than meticulous in this regard; they have more than occasionally used the term 'jurisdictional' to describe emphatic time prescriptions in rules of court."). The Supreme Court has gone as far as to criticize judicial opinions that do not take the time to separate subject-matter jurisdiction from a failure to state a claim, labeling "such unrefined dispositions as 'drive-by jurisdictional rulings' that should be accorded 'no precedential effect' on the question whether the federal court had authority to adjudicate the claim in suit." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006) (citing *Steel Co.*, 523 U.S. at 91). To comport with the Supreme Court's efforts at greater clarity, the Court begins at the beginning. "In general, subject-matter jurisdiction is a court's constitutional and statutory power or authority to entertain, hear, decide, and resolve a legal or factual dispute in favor of one party or the other." Howard M. Wasserman, *Jurisdiction and Merits*, 80 Wash. L. Rev. 643, 650 (2005) (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) (defining the term jurisdictional "in the sense of addressing the power of the courts to entertain cases concerned with a certain subject")) (other citations omitted); *see also Steel Co.*, 523 U.S. at 89 (referring to subject-matter jurisdiction as "the courts' statutory or constitutional *power* to adjudicate the case") (citation omitted). "It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) (citation omitted).

A few examples illustrate the real nature of subject-matter jurisdiction. The federal question statute sets forth that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The diversity statute sets forth that "[t]he district courts shall have original jurisdiction of all civil

actions where the matter in controversy exceeds the sum or value of $75,000" and the necessary diversity of citizenship exists.  28 U.S.C. § 1332.  Accordingly, the Court cannot intervene in family law matters where diversity jurisdiction does not exist and no federal statute creates a cause of action.  *See generally, e.g., Yaw v. State of New York Acting Through Chautauqua Cty. Dep't of Soc. Servs.*, No. 09-CV-499A, 2009 WL 3817674 (W.D.N.Y. Nov. 13, 2009).  A delay in payments under the Medicare Secondary Payer system does not, by itself, create subject-matter jurisdiction over tort cases that otherwise belong in state court.  *See generally Bond v. Rothlands, LLC*, No. 11-CV-275A, 2011 WL 6100617, at *1 (W.D.N.Y. Dec. 7, 2011).  Sometimes Congress chooses to make pinpoint changes to a court's subject-matter jurisdiction.  Again for the sake of example, the immigration statutes contain a number of provisions with language saying that "no court shall have jurisdiction" to review certain actions that the Attorney General takes in deportation proceedings.  *See* 8 U.S.C. § 1252(a)(2) (listing "[m]atters not subject to judicial review").  In diversity cases, Congress has eliminated the judicial doctrine of "derivative jurisdiction."  28 U.S.C. § 1441(f) ("The court to which a civil action is removed under this section is not precluded from hearing and determining any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim.").[2]  Congress has designated the Court of Appeals for the Federal Circuit as the court with the exclusive power to review administrative decisions concerning public safety officer death benefits.  42 U.S.C. § 3796c-2.  The Federal Circuit also has exclusive appellate jurisdiction for certain cases including patent cases.  *See*

_____

[2] There remains a dispute as to whether the elimination of derivative jurisdiction in 28 U.S.C. § 1441(f) carries over to 28 U.S.C. § 1442, which illustrates how to specific the discussion can be sometimes about the scope of subject-matter jurisdiction.  *Compare generally, e.g., Lopez v. Sentrillon Corp.*, 749 F.3d 347 (5th Cir. 2014); *Lombardi v. U.S.*, No. 15-CV-1047, 2016 WL 1604492 (W.D.N.Y. Apr. 22, 2016) *with State of N.D. v. Fredericks*, 940 F.2d 333 (8th Cir. 1991).

*generally* 28 U.S.C. § 1295.  Congress can set statutory time limits for taking an appeal and can make those time limits jurisdictional.  *See Bowles v. Russell*, 551 U.S. 205, 210 (2007).  Congress just conferred the Court with subject-matter jurisdiction over civil actions pertaining to theft of trade secrets used in, or intended for use in, interstate or foreign commerce, through the Defend Trade Secrets Act of 2016.  *See* Pub. L. 114-153, 130 Stat. 376 (May 11, 2016) (amending, *inter alia*, 18 U.S.C. § 1836); *see* 18 U.S.C. § 1836(c) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section.").  More germane to Donatello's case, Congress specifically conferred subject-matter jurisdiction on the Court with respect to claims arising under Title VII.  *See* 42 U.S.C. § 2000e-5(f)(3) ("Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter.").  Numerous other examples abound; what all of the above examples have in common is some delineation of whether a particular federal court, or all federal courts in general, have the authority to hear a category of dispute and to render judgments in cases falling in that category.

In contrast, some disputes that courts have labeled "jurisdictional" are better classified as disputes that go to the merits of a case or some kind of procedural prerequisite to relief.  The merits of the case include any issue affecting whether particular plaintiffs qualify for relief under statutory frameworks that courts generally have the power, or jurisdiction, to manage.  As the Supreme Court has written, any inquiry into the reach of a statute–which would include the scope of plaintiffs covered–"is to ask what conduct [the statute] prohibits, which is a merits question." *Morrison*, 561 U.S. at 254.  "When Congress does not rank a statutory limitation on coverage as

eat)

jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Arbaugh*, 546 U.S. at 516.  Accordingly, the Supreme Court has separated the statute authorizing bankruptcy courts to hear "core proceedings" from filing deadlines in the Bankruptcy Rules that "are claim-processing rules that do not delineate what cases bankruptcy courts are competent to adjudicate." *Kontrick*, 540 U.S. at 454.  A statutory prerequisite to initiating litigation may affect the merits of a case or may defeat the case altogether, but it does not affect subject-matter jurisdiction where it "imposes a precondition to filing a claim that is not clearly labeled jurisdictional, is not located in a jurisdiction-granting provision, and admits of congressionally authorized exceptions." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) (citation omitted).  With respect to Title VII, the Supreme Court has found that the 15-employee threshold of 42 U.S.C. § 2000e(b) "is an element of a plaintiff's claim for relief, not a jurisdictional issue." *Arbaugh*, 546 U.S. at 516.  The Supreme Court reasoned that "Congress could make the employee-numerosity requirement 'jurisdictional,' just as it has made an amount-in-controversy threshold an ingredient of subject-matter jurisdiction in delineating diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332.  But neither § 1331, nor Title VII's jurisdictional provision, 42 U.S.C. § 2000e–5(f)(3) (authorizing jurisdiction over actions 'brought under' Title VII), specifies any threshold ingredient akin to 28 U.S.C. § 1332's monetary floor.  Instead, the 15–employee threshold appears in a separate provision that does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Id.* at 514–15 (citation omitted).

### C.  Are the Exemptions in 42 U.S.C. § 2000e(f) Jurisdictional?

The best way to keep Donatello's situation in harmony with recent Supreme Court precedent is to find that Title VII's definition of "employee" goes to the merits of her case and not to the Court's subject-matter jurisdiction.  The definition of "employee" appears in the same section, Section 2000e, as the definition of "employer" that the Supreme Court addressed in *Arbaugh*.  As the Supreme Court explained in *Arbaugh*, Section 2000e is separate from Title VII's jurisdictional provision and contains no language implicating the Court's power to hear Title VII cases.  *Cf. CNA v. U.S.*, 535 F.3d 132, 142 (3d Cir. 2008) ("The scope-of-employment requirement of the FTCA [Federal Tort Claims Act] appears *in the same sentence* as Congress's grant of jurisdiction.  *See* 28 U.S.C. § 1346(b)(1).  '[J]urisdiction' in § 1346(b)(1) suggests that each clause of that provision represents a limitation on Congress's waiver of sovereign immunity and thus a limitation on federal courts' jurisdiction.") (emphasis added).  With respect to jurisdictional characteristics, all of the definitions in Section 2000e should be read the same way to treat that section as a whole.  To hold otherwise would leave litigants guessing as to which definitions were jurisdictional and would needlessly create conflict with 42 U.S.C. § 2000e–5(f)(3) and its broad mandate that the Court "shall have jurisdiction of actions brought under this subchapter."  *See, e.g., Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."); *In re Colonial Realty Co.*, 980 F.2d 125, 132 (2d Cir. 1992) ("It follows that in addressing arguably inconsistent requirements of two statutes, the courts must give effect to both

14

where possible."). Finding Section 2000e(f) non-jurisdictional also avoids the problem that the

County's approach

> proves unacceptable consequences. It suggests that a plaintiff must prove, as a
> matter of jurisdiction under [28 U.S.C.] § 1331, that the defendant is in fact
> bound by the federal law asserted as a basis for the requested relief. This
> construction of § 1331 conflates the "arising under" and "civil action" prerequisites
> into a rule that would divest a district court of jurisdiction if a plaintiff were
> unsuccessful in proving its case. It also conflicts with the principle that parties may
> not consent to subject matter jurisdiction, a corollary to the rule that subject matter
> jurisdiction cannot be waived.

*E.E.O.C. v. Chicago Club*, 86 F.3d 1423, 1428 (7th Cir. 1996) (citations omitted) (finding 42

U.S.C. § 2000e(b) non-jurisdictional prior to *Arbaugh*).

Of the Supreme Court cases that the Court cited above, *Arbaugh* has the closest facts to

Donatello's situation, but the other cases guide the Court's conclusion as well. Donatello put her

case in suit in the first place because she believes that Title VII *reaches* her situation and *prohibits*

the County's conduct. Among other elements of her claims, Donatello must plead and

successfully prove that she works for the type of employer that Title VII contemplates. *Cf. Knitter*

*v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014) ("To make out a prima facie

case of either wage discrimination or retaliatory termination under Title VII, a plaintiff must first

prove the defendant was her employer. If a plaintiff cannot meet her burden to prove the

defendant was her employer, her wage discrimination and retaliatory termination claims

necessarily fail. Factfinders must decide whether a defendant is an employer for purposes of Title

VII when doubts exist as to (1) whether a plaintiff is an employee or an independent contractor,

or, alternatively, (2) which one(s) of multiple individuals or entities is (are) the plaintiff's

employer.") The definition of "employee" affects whether Title VII reaches Donatello and thus,

under *Morrison*, "is a merits question."  561 U.S. at 254; *see also Townsend v. Shook*, 323 F. App'x

245, 250 (4th Cir. 2009) (unpublished decision) ("Turning to the subject matter jurisdiction issue,

we hold that application of Title VII's personal staff exclusion does not present a lack of subject

matter jurisdiction issue.  Rather, at the summary judgment stage, it presents the issue of whether

a Title VII plaintiff can prevail as a matter of law.") (citations omitted); *Xie v. Univ. of Utah*, 243 F.

App'x 367, 371–72 (10th Cir. 2007) (unpublished decision) ("[I]n light of the Supreme Court's

decision in *Arbaugh*, we now conclude that employee status is an element of [plaintiff's] Title VII

claims rather than a matter of subject matter jurisdiction . . . . We therefore conclude that

[plaintiff] was not required to prove as a threshold jurisdictional requirement that she was an

employee of the University.  Instead, her alleged employee status is an element of her Title VII

claims.") (citations omitted).  *Reed Elsevier* "appl[ied] this same approach," 559 U.S. at 163, from

*Arbaugh*, signaling to lower courts that any number of statutory definitions and procedural rules

will not limit the Court's subject-matter jurisdiction unless Congress so states in fairly clear

fashion.[3]  *Cf., e.g., Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 398 (2d Cir. 2014)

(applying *Arbaugh* and holding that certain limitations on antitrust claims under the Foreign Trade

Antitrust Improvements Act, 15 U.S.C. § 6a, "are substantive and nonjurisdictional in nature");

*Partington v. Am. Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 339 (4th Cir. 2006) (holding, in a case

---

[3] There is some commentary suggesting that *Morrison* and *Arbaugh* are in tension.  *Morrison*, according to the commentary, contains an "absolute declaration that statutory reach (that is, who the statute regulates or protects and what the statute prohibits) always is a merits issue."  Howard M. Wasserman, *The Demise of "Drive-by Jurisdictional Rulings,"* 105 Nw. U.L. Rev. Colloquy 184, 191 (2011).  *Arbaugh*, in contrast, allows for the theoretical possibility that Congress could blur the distinction between jurisdictional and merits issues by declaring an element of a claim to be jurisdictional.  *Id.*  For purposes of Donatello's case, it is enough to say that Congress in fact has not done anything (yet) to try to make Section 2000e(f) jurisdictional, thus leaving *Morrison* and *Arbaugh* functionally equivalent.

16

under the Securities Act of 1933, "that Congress did not clearly indicate that the failure of a plaintiff to qualify as a 'person purchasing' [under 15 U.S.C. § 77l(a)] was a jurisdictional limitation").  All of these situations follow the exhortation from *Kontrick* that "[c]larity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority."  540 U.S. at 455. Depending on what information emerges during discovery, Donatello's eligibility for relief under Title VII may require feedback from a jury or may be amenable to summary judgment.  Either way, Donatello's eligibility does not affect the Court's ability to handle this kind of case.

The principal cases that the County has cited do not change the above analysis.  *Kennedy v. N.Y.*, No. 14-CV-990S, 2016 WL 850910 (W.D.N.Y. Mar. 4, 2016), involved a granting of a Rule 12(b)(1) motion and the same definition of "employee" under 42 U.S.C. § 2000e(b), yet it contains no citations to *Morrison*, *Arbaugh*, *Reed Elsevier*, or *Kontrick*.  Despite its citation to Rule 12(b)(1), *Kennedy* is better understood as a test of the sufficiency of the plaintiff's claims under Rule 12(b)(6).  *Zagaja v. Vill. of Freeport*, No. 10-CV-3660 JFB SIL, 2015 WL 3507353 (E.D.N.Y. June 3, 2015), involves a confusing use of *Arbaugh*.  Within the span of one sentence and its adjacent citation, the court there concluded that "whether the Assistant and Deputy Chief of Police positions are covered under Title VII is not an essential element of a claim that requires the jury to try contested facts, but a jurisdictional issue," but then cited *Arbaugh*'s conclusion "that Congress made Title VII's employee-numerosity requirement an element of a plaintiff's claim for relief, not a jurisdictional issue."  2015 WL 3507353, at *4.  What is missing is a discussion of why

17

one definition in Section 2000e would be jurisdictional while another definition in the same

section would not be.  The only other mention of *Arbaugh* concerns waivers of non-jurisdictional

arguments, *id.* at *12, and offers no guidance here.

   The Court thus recommends denying the County's motion to dismiss under Rule 12(b)(1).

Since no combination of facts in this case would change the conclusion that Section 2000e(f) is

non-jurisdictional, an assessment of a possible factual challenge is unnecessary.

### D.  Sufficiency of Donatello's Claim under Rule 12(b)(6)

   Finding 42 U.S.C. § 2000e(f) non-jurisdictional does not end the Court's work.  While the

County framed most of its argument under Rule 12(b)(1), it did invoke Rule 12(b)(6) as an explicit

alternative (Dkt. No. 32-1 at 6), and much of its analysis could fit into the Rule 12(b)(6)

framework.  (*See also* Dkt. No. 45 at 14 n.5 ("If the Court decides that Donatello's employment

status is not jurisdictional, but rather, an element of her claim, the Court should still dismiss her

Title VII causes of action under Fed. R. Civ. P. 12(b)(6) for the same reasons discussed herein.").)

The Court can find that it has subject-matter jurisdiction over Donatello's case and still find that

Donatello falls under non-jurisdictional exemptions that render her unable to state a legally

cognizable claim under Title VII.

   "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not

akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has

acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's

liability, it stops short of the line between possibility and plausibility of entitlement to relief."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).

Courts assess Rule 12(b)(6) motions "accepting all factual allegations in the complaint as true, and

drawing all reasonable inferences in the plaintiff's favor." *Peter F. Gaito Architecture, LLC v. Simone

Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted). "On a

motion to dismiss, the court may consider any written instrument attached to the complaint as an

exhibit or any statements or documents incorporated in it by reference." *Yak v. Bank Brussels

Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (editorial and internal quotation marks and citation

omitted). "Simply stated, the question under Rule 12(b)(6) is whether the facts supporting the

claims, if established, create legally cognizable theories of recovery." *Cole-Hoover v. Shinseki*, No. 10-

CV-669, 2011 WL 1793256, at *3 (W.D.N.Y. May 9, 2011) (internal quotation marks and citation

omitted).

As a preliminary matter, the Court must decide whether to consider certain documents

that have become part of the record but lie outside of the second amended complaint. "Because a

Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of

its basis in evidence, a court adjudicating such a motion may review only a narrow universe of

materials. Generally, we do not look beyond facts stated on the face of the complaint, documents

appended to the complaint or incorporated in the complaint by reference, and matters of which

judicial notice may be taken." *Goel v. Bunge, Ltd.*, ___ F.3d ___, 2016 WL 1696597, at *2 (2d Cir.

Apr. 28, 2016) (internal quotation and editorial marks and citation omitted). "Where a document

is not incorporated by reference, the court may neverless consider it where the complaint relies

heavily upon its terms and effect, thereby rendering the document integral to the complaint. However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citations omitted).  "A document is integral to the complaint where the complaint relies heavily upon its terms and effect.  Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough.  In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint."  *Goel*, 2016 WL 1696597, at *3 (internal quotation and editorial marks and citations omitted).

Applying this standard, the Court will consider in part the County's March 6, 2013 letter to Donatello and her response to it.  (Dkt. No. 13-4 at 23–25.)  Donatello pled retaliation in the second amended complaint and cited the letter as a specific instance of retaliation.  The letter came the same day when, according to the second amended complaint, Violante ostensibly fired Donatello.  The occurrence of the letter in itself therefore affects whether Donatello plausibly has pled injury due to retaliation.  The copy of the letter and of Donatello's response that appear in the record will suffice for purposes of the pending motion, since the parties have not disputed the authenticity of the documents.  The Court will not delve into the accuracy of any information in

Case 1:15-cv-00039-LJV-HBS   Document 46   Filed 06/02/16   Page 21 of 32


the letter or the response, since the parties almost certainly disagree as to whether, for example, Donatello's "current behavior and treatment of your coworker [was] unacceptable and will not be tolerated." (Dkt. No. 13-5 at 23.)  In contrast, the Court will not consider the affidavit that Donatello submitted as part of her opposition papers. (Dkt. No. 40.)  Donatello prepared the affidavit to address a possible factual challenge to the Court's subject-matter jurisdiction.  The affidavit did not exist when Donatello filed the second amended complaint and thus would not have been referenced in the second amended complaint or otherwise integral to it.  Independent of the affidavit itself and for Rule 12(b)(6) purposes only, the Court will consider facts asserted in the affidavit only to the extent that they also appeared in the second amended complaint.

Whether Donatello has advanced a plausible and cognizable claim depends in part on whether she successfully pled that she is an eligible "employee" entitled to relief under Title VII. "The term 'employee' means an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.  The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision." 42 U.S.C. § 2000e(f).  To that end, Donatello has pled that she has worked for the County as an Assistant District Attorney continuously since 2004.  The parties do not dispute Donatello's work chronology, nor do they dispute that the County is an employer within the meaning of Title VII.  Donatello also has pled

various comments and actions that plausibly could have happened and plausibly could have violated Title VII and the NYSHRL if they did.  In fact, while the parties surely would dispute the significance of the March 6, 2013 letter and Donatello's response to it, they do not dispute that the letter and the response happened, and those documents plausibly fit into Donatello's theories of discrimination and retaliation.  The second amended complaint thus would appear to survive Rule 12(b)(6) scrutiny intact, but for the County's challenges under Section 2000e(f).  The County asserts that Donatello falls under the "personal staff" exemption, the "policy making" exemption, or both.  Mindful that "[n]o court has satisfactorily explored the distinction between exceptions or provisos to statutes and exclusions of certain entities from the defined class of entities covered by statutes" and that "[t]he distinction between statutory exceptions and definitional exclusions may hold important differences in the rules for allocating burdens of proof," *Chicago Club*, 86 F.3d at 1430–31, the Court will proceed assuming that the County bears the burden of showing that the exemptions apply.[4]  *Cf. U.S. v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967) ("We think it plain that the [defendants] carry the burden.  That is the general rule where one claims the benefits of an exception to the prohibition of a statute.") (citation omitted); *accord Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91–92 ("That longstanding convention is part of the backdrop against which the Congress writes laws, and we respect it unless we have compelling reasons to think that Congress meant to put the burden of persuasion on the other side.") (citation omitted).  The Court will treat the exemptions as affirmative defenses.  *See Oden v. Oktibbeha Cty.*, 246 F.3d 458, 467 (5th Cir. 2001) ("The personal staff exception is an affirmative

---

[4] This assumption does not conflict with *Arbaugh*'s treatment of Section 2000e(b).  The 15-employee threshold is part of the main definition in Section 2000e(b), not an exemption.

defense that must be pleaded under Rule 8(c)."); *accord Estate of Hamilton v. City of New York*, 627 F.3d 50, 57–58 (2d Cir. 2010) ("Courts have reached identical conclusions in cases involving similar 'exemptions' included in the FLSA.") (citations omitted), *superseded in part on other grounds by* N.Y.C. Local L. No. 85 (Oct. 3, 2005). "An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) if the defense appears on the face of the complaint." *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010) (internal quotation and editorial marks and citation omitted).

### i.  The "Personal Staff" Exemption

"The Second Circuit has not directly addressed the 'personal staff' exemption to Title VII's definition of employee, though it has considered the 'policy maker' exemption." *Kennedy*, 2016 WL 850910, at *3 (citations omitted). Other circuits that have considered the exemption did so at a point later than Rule 12(b)(6) motions, which complicates the effort to separate fact-sensitive aspects of the exemption from those that are purely a matter of law. *See, e.g., Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996) (affirming the application of the exemption at the summary-judgment stage); *Teneyuca v. Bexar Cty.*, 767 F.2d 148 (5th Cir. 1985) (same); *Ramirez v. San Mateo Cty. Dist. Attorney's Office*, 639 F.2d 509 (9th Cir. 1981) (affirming the application of the exemption on the eve of trial). Without direct appellate guidance as to how to address the exemption at the Rule 12(b)(6) stage, the Court begins by looking at the text and the history of the exemption. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citations omitted). Across both the personal-

staff and policymaker exemptions, Section 2000e(f) contains four main action words pertaining to different employees who are exempt: *elected*, *chosen*, *appointed* (as a relative of *appointee*), and *adviser*. Congress added all four words to Title VII at the same time and placed all four words in the same sentence.  To avoid rendering any one of the words superfluous, the Court must infer, if possible, that Congress intended each word to have a different meaning, whatever the exact meaning for each word is.  *See, e.g., TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (citations omitted); *Moskal v. U.S.*, 498 U.S. 103, 109 (1990) (rejecting an interpretation of the phrase "knowing the same to have been falsely made, forged, altered, or counterfeited" in 18 U.S.C. § 2314 that would have equated "falsely made" with "forged" or "counterfeited"); *U.S. v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every  clause and word of a statute . . . .") (citation omitted).  The four words appear to refer to four different paths by which employees otherwise covered under Title VII would find themselves exempt.  The words "elected" and "appointee" connote formal attainment of a job through the political process.  *See, e.g.*, 5 U.S.C. § 2105(a) (using the word "appointed" in the context of someone "acting in an official capacity"); *E.E.O.C. v. State of N.Y.*, 907 F.2d 316, 321 (2d Cir. 1990) (noting that "'appointment' ordinarily entails a selection or designation to fill a public office or position") (citation omitted); N.Y. County Law § 400(1) (defining "elective" county officers, including the district attorney, who "shall be elected"); *id.* § 400(4) (defining "appointive" officers who "shall continue to be appointed in the manner prescribed by law").  In contrast, "chosen" and "adviser" stand apart from the

24

formal processes of election and appointment and connote a more informal and unilateral hiring within the personal discretion of someone who is elected or appointed.[5]  N.Y. County Law § 702 supports this interpretation; it does not use the words "personal staff," and outside of perhaps statutes governing general appropriations, there would appear to be no need to make personal staffers the subject of a state statute and two levels of approval from two different political officers or entities.  *See id.* § 702(1) ("The board of supervisors shall have power to authorize the district attorney to appoint one or more assistant district attorneys.").  It is possible, therefore, to interpret all four words in a way that avoids conflict and overlap.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002) ("Our role is to interpret the language of the statute enacted by Congress. This statute does not contain conflicting provisions or ambiguous language.  Nor does it require a narrowing construction or application of any other canon or interpretative tool.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."), *quoted in Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257, 266 (2d Cir. 2016).  Assigning an informal and unilateral meaning to the term "chosen" comports with what Congress tried to accomplish when it drafted Section 2000e(f):

> It was repeatedly stressed on the floor and in the committee rooms of Congress that this exemption was to be very narrowly construed.  In response to Senator Williams' suggestion that law clerks and law assistants of personal counsel not be exempted, Senator Ervin first stated that they were "getting into a rather gray area," but later in the debate, he agreed that the only exempted personal staff members would be the "first line of advisers" of elected officials.
>
> Senator Javits defined a "personal assistant" as a secretary, administrative assistant,

---

[5] Incidentally, the word "adviser" is the only one of the four words that does not come with its own verb indicating the method of selection.  Given that "advisers" are not set up in Section 2000e(f) as elected or appointed, and given that the modifier "immediate" is somewhat analogous to "personal," the Court infers that "advisers" are "chosen" in the same informal and unilateral way as personal staff.

> or legislative aide, and an "immediate adviser" as a cabinet member.  Senator Ervin
> agreed with these designations.  While a legal adviser of a board of commissioners
> whose members were chosen by election would, according to Senator Ervin, be
> excluded, clerks or secretaries would not be excluded.

1-4 Lex K. Larson, *Larson on Employment Discrimination* § 4.06 (LexisNexis rel. 100 Apr. 2016)

(citations omitted); *see also Mohasco Corp. v. Silver*, 447 U.S. 807, 818 (1980) ("We therefore turn to

the legislative history, but in doing so we emphasize that the words of the statute are not

ambiguous.  Nor does a literal reading of them lead to absurd or futile results.") (citation omitted).

      Applying the above understanding makes apparent that the personal-staff exemption does

not fit how Donatello obtained her job.  Donatello was not informally and unilaterally "chosen" in

any sense consistent with what Congress had in mind.  As Donatello has pointed out, her job

exists as a result of N.Y. County Law § 702.  Under Section 702(1), the district attorney appoints

"one or more assistant district attorneys," but only after receiving authorization to do so from the

county board of supervisors.[6]  Two different elected positions or entities, therefore, had to

collaborate to bring about Donatello's appointment.  The process would have been much more

formal and complicated than the type of informal and unilateral hiring that Congress

contemplated for personal staffers like secretaries, administrative assistants, and legislative aides.

The personal-staff exemption thus does not apply to Donatello in any way that would warrant

dismissal under Rule 12(b)(6).

      The case law that the County has cited does not change the Court's conclusion.  For

example, in *Wall v. Coleman*, 393 F. Supp. 826 (S.D. Ga. 1975), the court found that appointed

assistant district attorneys also were personal staff because they had the kind of close "personal

---

[6] The Court takes judicial notice that Niagara County has a legislature, which is legally equivalent to a board of supervisors.  *See* N.Y. County Law § 150-a.

relationship" with the district attorney that the "aides-de-camp of a general officer" have with their military commander. *Id.* at 831. That conclusion is fact-sensitive and overlooks how, as explained above, the words "chosen" and "appointee" have to have different meanings in Section 2000e(f). The Court thus finds *Wall* unpersuasive. *Bishop v. Oregon*, No. CIV.03-138-CO, 2004 WL 966232 (D. Or. Feb. 23, 2004), *report and recommendation adopted sub nom. Bishop v. State of Oregon*, No. CIV. 03-138-CO, 2004 WL 3214423 (D. Or. May 1, 2004), a case decided at the summary-judgment stage, is unpersuasive at this stage for similar reasons: The "intimate working relationship" determined after discovery in *Bishop* may or may not be found here after discovery, and *Bishop* also assumes that appointees also can be chosen to act as personal staff. If the County wants to argue that an appointee (whether a policy maker or not) additionally can acquire day-to-day traits of a personal staffer and qualify for multiple exemptions then it may do so on a summary-judgment motion following a thorough factual inquiry.

ii. *The "Policy-Maker" Exemption*

In contrast to the personal-staff exemption, the policy-maker exemption has an appellate history. Part of the appellate history comes from analysis of 29 U.S.C. § 630(f), a definitional provision for the Age Discrimination in Employment Act ("ADEA") that was patterned after Section 2000e(f)[7] and repeats it nearly verbatim.[8] The Court can turn to Section 630(f) for guidance. *See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 823 (3d Cir. 1999)

---

[7] Section 630(f) originally had no exemptions from the definition of "employee." Pub. L. No. 90-202, 81 Stat. 602 § 11(f) (1967). Section 2000e(f) did not, either, but its exemptions were added in 1972. Pub. L. 92-261, 86 Stat. 103 § 2(5) (Mar. 24, 1972). The exemptions in Section 630(f) were added in 1974. Pub. L. 93–259 § 28(a)(4), 88 Stat. 55 (Apr. 8, 1974).

[8] The only differences that the Court can discern between 42 U.S.C. § 2000e(f) and 29 U.S.C. § 630(f) are cosmetic: The latter statute uses "any employer" instead of "an employer" and spells "policymaking" as one word, not two.

("When the ordinary meaning of a statute and the statute's legislative history fail to provide sufficient guidance to a term's meaning, sound principles of statutory construction instruct the Court to look to other statutes pertaining to the same subject matter which contain similar terms.") (citation omitted).  Like its Title VII counterpart, Section 630(f) "exempts '[i] any person elected to public office . . . , or [ii] any person chosen by such [elected] officer to be on such officer's personal staff, or [iii] an appointee on the policymaking level or [iv] an immediate advisor with respect to . . .  powers of the office.' 29 U.S.C. § 630(f).  Categories [i], [ii] and [iv] plainly contemplate exemption for persons with a direct relationship to an elected official.  While category [iii] does not contain clear language specifically stating that an appointee must be directly appointed by an elected official to fall within section 630(f), the placement of category [iii] in the middle of a statute primarily exempting elected officials from ADEA coverage strongly indicates that this provision must be read to require appointment by an elected official." *Tranello v. Frey*, 962 F.2d 244, 249 (2d Cir. 1992) (alterations in the original) (citation omitted).  *Tranello*'s treatment of the policy-maker exemption would appear to favor the County outright, to the extent that there is no dispute that Donatello is an appointee.

The exemption does not stop at appointee status, however; Donatello also would have to be an appointee "on the policy making level," and to such a clear degree that dismissal under Rule 12(b)(6) would be appropriate.  This is where the County's argument runs into trouble.  In *Gregory v. Ashcroft*, 501 U.S. 452 (1991), the Supreme Court assessed whether Section 630(f) of the ADEA applied to state judges.  The Supreme Court said no, because "'appointee on the policymaking level' is sufficiently broad that we cannot conclude that the statute plainly covers appointed state

28

judges.  Therefore, it does not." *Gregory*, 501 U.S. at 467.  The Supreme Court reached this conclusion after observing that "'appointee at the policymaking level,' particularly in the context of the other exceptions that surround it, is an odd way for Congress to exclude judges; a plain statement that judges are not 'employees' would seem the most efficient phrasing.  But in this case we are not looking for a plain statement that judges are excluded.  We will not read the ADEA to cover state judges unless Congress has made it clear that judges are *included*." *Id.*  The Court has a similar thought about Donatello's situation.  The title of Assistant District Attorney does not unambiguously bring policy-making to mind.  Nonetheless, the clash between the job and the possibility of policy-making responsibilities is less stark than the scenario in *Gregory* and thus leaves some room for factual development.  *Butler v. N.Y.S. Dep't of Law*, 211 F.3d 739 (2d Cir. 2000), while coming at the summary-judgment stage, gives guidance regarding factual development. "[C]ourts should look at the attributes of the position, not the actual performance of the job, to determine whether the employee was a bona fide executive or high policymaker." *Butler*, 211 F.3d at 749 (citation omitted).  Donatello makes hardly any mention of her overall duties, let alone any policy-making duties, in the second amended complaint.  If Donatello turned out not to have any policy-making duties then that conclusion would be consistent with the finding, under a provision of New York's County Law analogous to Section 702, that "Assistants appointed by the District Attorney pursuant to that section are subordinates." *Schumer v. Holtzman*, 454 N.E.2d 522, 524 (N.Y. 1983).  The March 6, 2013 letter and Donatello's response hint at some distance from policy-making responsibilities but are not conclusive.  Discovery in the ordinary course may yet uncover that Donatello was one of the County's "appointees as would normally work closely with

and be accountable to the official who appointed them." *Tranello*, 962 F.2d at 250 (internal

quotation marks and citation omitted); *see also* Equal Employment Opportunity Comm'n, EEOC

Dec. No. 78-42 (1978) ("In exempting policymaking appointees, Congress realized the necessity of

allowing elected officials complete freedom in appointing those who would direct state and local

departments and agencies.  These individuals must work closely with elected officials and their

advisors in developing policies that will implement the overall goals of the elected officials.  In

order to achieve these goals, an elected official is likely to prefer individuals with similar political

and ideological outlooks.  Congress intended to allow elected officials the freedom to appoint

those with whom they feel they can work best.").  Such a dispute might become appropriate at the

summary-judgment stage but is too early now.  The policy-making exemption thus does not apply

to Donatello at this time.

The County has failed to establish that the second amended complaint contains enough

facts on its face to warrant immediate application of the personal-staff or policy-making exemptions

as affirmative defenses.  The Court thus recommends denying the County's motion under Rule

12(b)(6).

### E.  *Discovery-Related Cross-Motions*

Given the Court's recommendations regarding the County's motion to dismiss, the

recommendations regarding the discovery-related cross-motions will be brief.[9]  The County

premised its motion for a stay of discovery on the impact that full or partial dismissal would have

---

[9] Discovery-related motions by themselves are non-dispositive.  *See, e.g., Boice v. M+W U.S., Inc.*, 130 F. Supp. 3d 677, 685 (N.D.N.Y. 2015).  Out of caution, however, the Court will address the pending motions as part of this Report and Recommendation, since the outcome of the motions is intertwined with the outcome of the motion to dismiss.  *See id.*; *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *20 n.3 (S.D.N.Y. Mar. 25, 2015) (citations omitted).

on the amount of discovery that it would have to furnish.  (*See, e.g.,* Dkt. No. 36-3 at 5.)  Denial of

the motion to dismiss eliminates the County's concerns; any separate concerns about how

discovery proceeds in the ordinary course can be addressed with future motions tailored to the

specific problem at hand.  Meanwhile, Donatello made her cross-motion to compel discovery

because "the Court is tasked with making factual findings on a motion to dismiss for lack of

subject matter jurisdiction, [and] discovery is necessary so as to allow Plaintiff the opportunity

to prove her case and present all relevant facts to rebut Defendant's motion to dismiss."  (Dkt. No.

39-1 at 2.)  Upon formal denial of the motion to dismiss, jurisdictional fact-finding no longer will

be necessary.  Again, any discovery disputes that arise between the parties in the future can be

addressed as needed in the future.  The Court thus recommends denying both discovery-related

cross-motions as moot.

IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying the County's

motion to dismiss (Dkt. No. 32).  The Court also recommends denying the parties' discovery -

related cross-motions (Dkt. Nos. 36, 39) as moot.

V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by

electronic filing on the date below.  Any objections to this Report and Recommendation must be

electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP

72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's

report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003)

(citations omitted).

SO ORDERED.

_\_/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: June 2, 2016